ILLINOIS CENTRAL RAILROAD COMPANY ET AL. *v.* GEORGE W. ELY.

1. LIBEL. *Railroad employe. Discharge. Clearance paper. Burden of proof.*

A clearance paper given a discharged employe, at his request, reciting: "Cause for leaving service, unsatisfactory service, conduct good," is not libelous per se, and the employe who sues upon it as a libel has the burden of proving that it is untrue, was known to be false and was published from malicious motives.

2. SAME. *Evidence.*

In an action for libel by a discharged railroad employe, predicated of a clearance paper furnished him at his request, it is error to permit a witness to testify that the railroad company's supervisor of tracks had said in witnesses presence that the roadmaster, who was a defendant to the suit, was going to have plaintiff discharged because he had testified adversely to the company in a law suit.

3. SAME. *Incompetent evidence. Effect of its admission, and subsequent exclusion.*

Error in receiving incompetent evidence of malice in a libel suit, which was the only showing thereof, and which seemed likely to have induced the verdict, is not cured by the court's telling the jury at the close of the case, after the evidence had remained with them over night, that, on reflection, it was improper proof, and to dismiss it from their minds.

4. SAME. *Witness. Disregard of rule.*

Refusing to permit a witness to testify in rebuttal because he has disobeyed the rule for the exclusion and separation of witnesses, while permitting his testimony in chief to be contradicted, is error.

FROM the circuit court of Tallahatchie county.

HON. SAMUEL C. COOK, Judge.

Ely, appellee, was plaintiff in the court below; the railroad company was defendant there. From a judgment for $25,000

in plaintiff's favor defendant appealed to the supreme court. The facts are fully stated in the opinion of the court.

*Blewett Lee,* for appellant.

I. (1) The language is not defamatory. It is immaterial that the defendants *ought* to have been satisfied with the plaintiff's work, if, in fact, they were not. *Rodgers* v. *Kline,* 56 Miss., 816; 6 Am. & Eng. Enc. Law (2d ed.), 464 (1898); 21 Am. & Eng. Enc. Law (1st ed.), 714, 715; *Rossiter* v. *Cooper, 23* Vt., 522, 524 (1851); *Spring* v. *Ansonia Clock Co.,* 24 Hun., 175, 176 (1881); *Johnson* v. *Bindseil,* 8 N. Y. Suppl., 485, 486 (1890); Note in 54 Am. Rep., 711, 712, citing *Tyler* v. *Ames,* 6 Lans., 280; *Hart* v. *Hart,* 22 Barb., 606; 24 Am. & Eng. Enc. Law (2d ed.), 1234 (1903); *Frary* v. *American Rubber Co.,* 53 N. W. Rep., 1156 (Minn., 1893); *Koehler* v. *Buhl,* 54 N. W. Rep., 157, 158 (Mich., 1893); *Allen* v. *Mutual Compress Co.,* 14 So. Rep., 362 (Ala., 1893); *Bush* v. *Koll.* 29 Pac. Rep., 919 (Colo., 1892). "Performance to the satisfaction of Promisor," 46 Central Law Journal, 360 (1898).

(2) Discommendatory words are not actionable *per se* unless defamatory. 18 Am. & Eng. Enc. Law (2d ed.), 916 (1901); *Wallace* v. *Bennett,* 1 Ab. N. Cas., 478 (N. Y., 1877); *Kelly* v. *Partington,* 5 B. & Ad., 645, 649 (1833); *Sheahan* v. *Ahearne,* L. R. 9 Ir., 412, 414 (1875); *Terwilliger* v. *Wands,* 17 N. Y., 54; 72 Am. Dec., 420, 423 (1858); *Knight* v. *Blackford,* 3 Mackey, 177; 51 Am. Rep., 772, 775 (1884); *Reid* v. *Providence Journal Co.,* 20 R. I., 120, 121, 123, 124, 125; *Ratzel* v. *N. Y. News Pub. Co.,* 67 App. Div. (N. Y.), 598, 600 (1902); *Latimer* v. *I. C. R. R. Co.,* 25 So. Rep., 1038.

(3) Words imputing want of skill in a particular case are not actionable *per se.* 18 Am. & Eng. Enc. Law (2d ed.), 962; *Rogers* v. *Kline,* 56 Miss., 808, 817 (1879); *Tobias* v. *Harland,* 4 Wend., 537, 540 (1830); *Marlin Firearms Co.* v. *Shields,* 171 N. Y., 384, 390 (1902), 59 L. R. A., 310, 313; *Swan* v. *Tap-*

*pan,* 5 Cush. (Mass.), 104, 109 (1849); *Dooling* v. *Budget Publishing Co.,* 144 Mass., 258, 259 (1887).

II. The plaintiff cannot maintain an action on account of acts which he himself procured to be done. 18 Am. & Eng. Enc. Law (2d ed.), 1018; *King* v. *Waring,* 5 Esp., 13, 15; *Smith* v. *Wood,* 3 Camp., 323; *Rogers* v. *Clifton,* 3 B. & P., 587, 591, 592 (1803); *Irish-American Bank* v. *Bader,* 59 Minn., 329, 330, 331 (1894); *Schoepflin* v. *Coffey,* 162 N. Y., 12, 20 (1900); *Howland* v. *Blake Mfg. Co.,* 156 Mass., 543, 570 (1892).

III. There was no *publication* by the railroad company. *Sylvis* v. *Miller,* 96 Tenn., 94, 95 (1895); *Wilcox* v. *Moon,* 24 Atl. Rep., 244, 245 (Vt., 1892); *Railroad Co.* v. *Delaney,* 102 Tenn., 289, 294 (1899); *Owen* v. *Ogilvie Publishing Co.,* 32 App. Div. (N. Y.), 465, 466 (1898); *Landis* v. *Campbell,* 79 Mo., 439, 440 (1883); *Gardner* v. *Anderson,* Fed. Cas. No. 5220; s. c., 22 Int. Rev. Rec., 41.

IV. The alleged publications were privileged and were not malicious. (1) A railroad company is under no obligation to give a "clearance" to its employes. *C., C., C. & St. L. Ry. Co.* v. *Jenkins,* 174 Ill., 398, 402 (1898). (2) A master is not bound to give a character to a servant. *Carroll* v. *Bird,* 3 Esp., 201, 202. (3) Express malice is necessary to overcome privilege. *Railway Co.* v. *Brooks,* 69 Miss., 168, 185 (1891). (4) The act was privileged. 18 Am. & Eng. Enc. Law (2d ed.), 1034; *Bacon* v. *Mich. Cent. R. R. Co.,* 66 Mich., 166, 170 (1887); *Missouri Pacific Ry. Co.* v. *Richmond,* 73 Tex., 568; 15 Am. St. Rep., 794, 800 (1889); *Hebner* v. *Great Northern Ry. Co.,* 78 Minn., 289, 291-2 (1899); *Boyer* v. *Western Union Telegraph Co.,* 42 S. E. Rep., 246 (1903); *Brown* v. *N. & W. Ry. Co.,* 42 S. E. Rep., 664 (Va., 1902). (5) No malice was proved. (6) The "clearance" stated the truth.

V. The damages were excessive. (1) No custom was proved. *C., C., C. & St. L. Ry. Co.* v. *Jenkins,* 174 Ill., 398, 407 (1898). (2) Defendants are not responsible for damages caused by the

plaintiff's publication of the clearance. *Railroad* v. *Delaney,* 102 Tenn., 289 (1899). (3) The defendants are not liable for the plaintiff's failure to secure employment unless such failure was caused solely by the language of the clearance. *Vickers* v. *Wilcocks,* 8 East., 1, 4 (1806); *Cramer* v. *Cullinane,* 2 McArthur (D. C.), 197, 201 (1875); *Hallock* v. *Miller,* 2 Barb. (N. Y.), 630, 632 (1848). (4) The proof of special damages having failed, the action cannot be sustained. *Hirshfield* v. *Fort Worth National Bank,* 83 Tex., 452; 29 Am. St. Rec., 660, 666 (1892); *Barnes* v. *Trundy,* 31 Me., 321, 324 (1852); *Fry* v. *McCord Bros.,* 95 Tenn., 678, 694 (1895); *Railroad* v. *Delaney,* 102 Tenn., 289, 295 (1899); 18 Am. & Eng. Enc. Law, (2d ed.), 1085-6 1088 (1901). (5) The recovery is limited in any event to the amount of special damages proved. *Herrick* v. *Lapham,* 10 Johnson (N.Y.), 281, 283 (1813); *Giacona & Son* v. *Bradstreet Co.,* 48 La Ann., 1191, 1193 (1896); *Windisch-Muhlhauser Brewing Co.* v. *Bacon* (Ky., 1899), 53 S. W. Rep., 520. (6) The defendants are not liable in this action for damages, if any, arising from plaintiff's discharge. *Henry* v. *Pittsburg etc. R. Co.,* 139 Pa. St., 289, 297 (1890). (7) Considered as giving exemplary damages the verdict should be set aside on the ground of its excessive character. *Burkett* v. *Lanata,* 15 La. Ann., 337, 339 (1860); *McCarthy* v. *Niskern,* 22 Minn., 90, 92 (1875); *Houston & Texas Central R. R. Co.* v. *Nichols* (Tex.), 9 Am. & Eng. R. R. Cas., 361, 364 (1882); *Mobile & Montgomery R. R. Co.* v. *Ashcraft,* 48 Ala., 33; *Louisville, etc., R. R. Co.* v. *Minogue,* 90 Ky., 369, 373, 375 (1890); *Peterson* v. *Western Union Telegraph Co.,* 75 Minn., 368, 375-6 (1899); 7 Law Notes 90; *Pittsburg, etc., R. Co.* v. *Donahue,* 70 Pa. St., 179. (8) Case where $25,000 allowed. *Young* v. *Fox,* 26 App. Div., 261 (N. Y. 1898).

VI. A new trial should be granted on the ground of the verdict against Sheehan, the roadmaster, being swelled by evidence as to the wealth of the railroad company. *Clark* v. *Newsam,* 1 Exc., 131, 139 (1847); *Pardridge* v. *Brady,* 7 Ill. App., 639,

644 (1880) ; *McCarthy* v. *De Armit,* 99 Pa. St., 63, 72 (1881) ; *Lombard* v. *Batchelder,* 58 Vt., 558, 560 (1886). (1) For this reason a new trial should be allowed. *Washington Gas Light Co.* v. *Lansden,* 172 U. S., 534, 551, 552, 555 (1898) ; *Albright* v. *McTighe,* 49 Fed. Rep., 817, 823 (1892). (2) The defendants in this case are not jointly liable. *Warax* v. *C., N. O. & T. P. Ry. Co.,* 72 Fed. Rep., 637, 641, *et seq* (1896), and cases cited. *Helms* v. *No. Pac. Ry. Co. el al.,* 120 Fed. Rep., 389 (1903) ; *Herman Berghoff Brewing Co.* v. *Przbylski,* 82 Ill. App., 361, 367, *et seq.* (1889), and cases cited. (3) Sheahan is responsible to the railroad company for all damages recovered in this action. 20 Am. & Eng. Enc. Law (2d ed.), 51 (1902) ; *Palmer* v. *Wick & Pulkneytown Steam Shipping Co.* (1894), A. C., 318.

VII. Jarmon should have been allowed to testify in rebuttal. *Ferguson* v. *Brown,* 75 Miss., 214, 224 (1897), 21 So. Rep., 603, 605 ; *Timberlake* v. *Thayer,* 76 Miss., 83 (1898), 23 So. Rep., 707.

VIII. The evidence of Jarmon's alleged message to Ely by Clogston was not admissible. (1) It was not admissible to contradict Jarmon. *Williams* v. *State,* 73 Miss., 820, 824, 830 (1896) ; *Garner* v. *State,* 76 Miss., 515, 521 (1898). (2) The injurious effect of this evidence was not cured by the court's charge. *Chism* v. *The State,* 70 Miss., 754 ; *Penfield* v. *Carpender,* 13 Johnson (N. Y.), 350 (1816) ; *Erben* v. *Lorillard,* 19 N. Y., 299, 302 (1859) ; *Detroit & Milwaukee R. R. Co.* v. *Van Steinburg,* 17 Mich., 99, 108 (1868) ; *Sinker* v. *Diggins,* 76 Mich., 557, 563 ; *Coleman* v. *People,* 58 N. Y., 555, 561 (1874) ; *City of Chicago* v. *Wright & Lawther Oil and Lead Mfg. Co.,* 14 Ill., App., 119, 124 (1883) ; *State* v. *Mix,* 15 Mo. 153, 160 (1851) ; *Stale* v. *Meader,* 54 Vt., 126, 130 (1881) ; *Castleman & Griffin,* 13 Wis., 535, 539 (1861).

IX. The court should render judgment in favor of the defendant, or at least grant a new trial.

*Mayes & Longstreet,* and *J. M. Dickinson,* on the same side.

*Dinkins & Caldwell,* for appellee.

The publication of the libel consisted in its dictation by Sheehan, roadmaster, to a stenographer in his office, by whom it was written on a type machine, and after being signed by Sheehan its transmission by the hands of the clerk to the office of Philbrick, superintendent, by whom it was signed and who had one of the clerks in his office to make an impression copy of it in a book kept for that purpose, which book, it was admitted, was open to the inspection of the employes of the company. After being signed by Philbrick it was returned by the hands of a clerk to the roadmaster's office, where a copy of it was filed away as a record of that office, and from there sent to Jarmon, road supervisor, who, after inspecting it, placed it in an envelope which he sealed and directed to Ely and placed it in a box or pigeon hole in the depot at Sardis, from which it was taken by the hands of a porter and delivered to Ely's wife who opened it and showed it to Clogston before it was seen by Ely.

The admission was made that the impression book in the superintendent's office was open to the inspection of the employes of the company of which it was shown there was some 30,000. It was not limited as it should have been to such officers of the company as had the employment of servants in the various branches of its service, which would have brought it within the privilege of the defendant company had the statement been true, or been made in perfect good faith.

The publication was complete before the clearance finally left the office of the roadmaster, where it was first dictated to a stenographer and by him reduced to writing on a type machine, and then by the hands of a clerk transmitted to the office of the superintendent to be signed by him and by a clerk copied in the impression copy book, and then returned to the office of the roadmaster, where it was again seen and handled by clerks before being sent to Jarmon, the road supervisor. *Gambrill v. Schooley,* 93 Md., 48; 77 Am. St. Rep., 414; *Pullman* v. *Hill,* 1 Q. B. D., 529.

Defendants by their pleas set up their privilege and the truth of the statement in the clearance as their defenses and relied in the court below on the authority of the cases of *Missouri, etc., R. Co.* v. *Richmond,* 73 Tex., 569, 15 Am. St. Rep., 794, urging that the plaintiff could not recover unless he met the burden which was upon him, to show that the publication was made with express malice toward the plaintiff, and this view seems to have been adopted by the court, as all the instructions given for the defendants embody the idea that unless the publication was believed to have been, not only false, but malicious, that the jury should find for defendants. Granting this to be the law of the case it was properly left to the jury to determine whether or not such malice in fact existed and moved the defendants to make the publication complained of, as there was much evidence that plaintiff was discharged, not for the reason stated in the clearance, but because of his testimony in the Clogston case.

The evidence produced by the plaintiff in support of the allegation that he was discharged through malice and that the statement in clearance was false and that it was maliciously uttered and published because of his having testified to the truth in the Clogston case, was sufficiently clear to justify the submission of the question to the jury for determination.

The assertion of defendants that the facts stated in the clearance was true, or that they believed them to be true, is not conclusive as to what their motive was, whether they did or not so believe was a question for the determination of the jury. *Railway Co.* v. *Brooks,* 69 Miss., 168.

The occasion of the issuance of the clearance was, no doubt, privileged, that is, if the statements it contained were true. "The term privilege, as applied to a communication alleged to be libelous means simply that the circumstances under which it was made are such as to repel the legal inference of malice, and to throw on the plaintiff the burden of offering some evidence of its existense beyond the mere falsity of the charge." *Railway Co.* v. *Brooks, supra.* In that case there was nothing be-

yond the falsity of the charge except a few slight circumstances indicating a malicious purpose introduced in evidence, but the court permitted the case to go to the jury for them to determine the motive of defendant in writing the letters complained of.

In this case, we have not only substantial proof of the falsity of the statement from plaintiff's witnesses, but also the official report of the inspection made by the defendant company, as well as the declaration of Jarmon, Ely's superior, that his work was good and satisfactory, and his further statement made directly to Clogston and indirectly to Ely, that he was discharged because of his testimony in the Clogston case.

The defendants were given an opportunity to retract or repair the wrong to plaintiff but they refused to do so. This alone, when considered in connection with the evidence of the falsity of the statement, was sufficient to authorize the jury to conclude that defendant's purpose was malicious. 18 Am. & Eng. Enc. Law (2d ed.), 1006, sec. 7, 1007, sec. 14.

The facts in this case are almost without a precedent in the history of our jurisprudence. We have discussed it heretofore from the standpoint of our law as it relates to libel and slander from which the cases cited have all been selected, but there is a broader and more comprehensive principle involved here than we find considered in the law of libel and slander. A man may suffer an injury by the utterance and publication of a libel or slander, a wrong he is entitled to have repaired, and juries may assess punitive damages in such cases, but the damages resulting therefrom are ordinarily confined to the injury to character, reputation and business. If the damage here was confined within such limits, it might be considered less grave and far reaching in its consequences, as men may live down and overcome the results of a slanderous utterance against their characters or business, but in this case there is a secret society, a combination of railroads, behind such utterance that makes its effects impossible to overcome. It is a business combination backed up by great wealth and influence, a

dominant power in commerce that furnishes employment to millions who, by reason of having made a life study of its particular line of work, become practically unfitted to engage in any other occupation. Such combinations enforce by secret iron rule the character and reputation, whether true or false, that one of its members may give to an employe. While such rules may operate to protect the railroads from the employment of unreliable servants and do work good to the public, they may also be used by the vicious for the accomplishment of malevolent ends.

In such case we do not understand that publication is necessary as in the case of a libel. A clearance, falsely stating the cause of discharge, where such cause will prevent, under the rules of the railroads, the person to whom it is issued from getting employment, even though it is seen only by the officers of the company issuing and signing it, as certainly and inevitably works injury as if it received extensive publication, for, who can deliver him from it? Is he not bound, as it were, to a firebrand or dead body which, if he holds to, his means of earning a livelihood are taken from him, and which, if he leaves behind or destroys, his request for work will not be considered?

The one case, and the only case, that we have been able to find involving the principles, the exact question that this case presents, it is the decision of the supreme court of Kentucky in *Hundley* v. *Louisville, etc., R. R. Co.,* 105 Kentucky, 162, 48 S. W. Rep., 429, 88 Am. St. Rep., 298, which lays down the very principles that should be given here, and we invite the court's attention to the whole opinion in that case.

On the question of the amount of the verdict, it can hardly be said to be excessive. It was proven that the Illinois Central Railroad Company had a capital stock of $76,000,000, and that it was worth on the market $138, making its wealth over $100,-000,000.

*Brewer & Creekmore,* on same side.

The best practice is to submit the question to the jury and al-

low them to take into consideration all the facts and circumstances surrounding the publication, together with the publication itself, and see from the whole in what spirit the publication was made, whether in good faith or in malice. This is the true and best rule. See *White* v. *Nichols,* 3 How. (U. S.), 266, wherein Mr. Justice Daniel, delivering the opinion of the court, page 291, said: "And we think that in every case of a proceeding like these just enumerated, falsehood and the absence of probable cause will amount to proof of malice." And, again, page 292, said: "This question, however, need not at the present time be reasoned by the court; it has by numerous adjudications been placed beyond doubt or controversy. Indeed, in the very same cases that are applicable to this question, they, almost without an exception, concur in the rule that the question of malice is to be submitted to the jury upon the face of the libel or publication itself. We refer for this position to *Wright* v. *Woodgate,* 2 Crompton, Mess. & Ros., 573; *Fairman* v. *Ives,* 5 Barn. & Ald., 642; *Robinson* v. *May,* 2 Smith., 3; *Flint* v. *Pike,* 4 Barn. & Cres., 584, per Littledale, J., *Ib.,* 247; *Bromage* v. *Prosser, Blake* v. *Pilford,* 1 Mood. & Rob., 198; *Parmeter* v. *Coupland,* 6 Mess. & Welby, 105; *Thompson* v. *Shackel,* 1 Moo. & Mal., 187; other cases might be adduced to the same point." In support of this view see 69 Am. Dec., 621, 57 L. R. A., 475; *Hogan* v. *Hundley,* 18 Md., 177; *McLean* v. *Scripps,* 52 Mich., 214; *Cougler* v. *Rhodes,* 21 So. Rep., 109, and for authority upon the position that the evidence in this case is sufficient to justify the court in submitting the question to the jury we refer the case of *Garrett* v. *Dickerson,* 19 Md., 418; Townshed on Slander and Libel, 421, 15 Ark., 345, 34 Pa. St. Rep., 117, 6 Jones Law (N. Car.), 409; Townshed on Slander and Libel, sec. 388, and note.

The fact that the publication was false, and that Sheehan refused to tell the plaintiff why he discharged him under the circumstances in this case is sufficient evidence of malice for the court to submit the question to the jury.

The court below instructed the jury peremptorily that the publication was privileged unless uttered maliciously, and we met this burden abundantly, if the testimony is to be believed, and the weight of the testimony, we respectfully submit, is a question for the jury. Newell on Slander and Libel, p. 478, sec. 68, where the author says: "If the occasion is absolutely privileged, judgment will be given for the defendant; if, however, the occasion is one of qualified privilege only the burden is cast of proving actual malice on the part of the defendant, and if he gives no such evidence, it is the duty of the court to nonsuit him or to direct a verdict for the defendant. If, however, he does give any evidence of malice sufficient to go to the jury, then it is a question for the jury whether or not the defendant was actuated by malicious motives in publishing the defamatory words."

But defendants in this case undertook to show that the plaintiff's work was in fact unsatisfactory, and joined issue with us upon this position, claiming that it was a circumstance in their favor, showing that the publication was not made maliciously, and when Mr. Sheehan says his work was unsatisfactory before inspection, we contradict him with his own letter, and when he said that his service was unsatisfactory because it did not show up at inspection, we contradict him with the report of the inspectors, and he was one of the inspectors.

While it is true that Mr. Sheehan, Mr. Jarmon, and Mr. Philbrick all undertook to say that Ely's services were in fact unsatisfactory, when pressed on cross examination they were wholly unable to point out a single fact as an item that Ely did or left undone that was unsatisfactory. It is true that they would affirm that his services were unsatisfactory, and use this language: "That he failed to hold up his corner." *Bacon v. Michigan, etc., R. Co.,* 31 Am. & Eng. R. R. Cases, 357.

We submit that the publication in this case was an invasion of the plaintiff's rights and practically amounted to blacklisting him; that such is the practical result as shown by the testimony

in the case, and while it is a hard thing to prove, because it is surrounded by all the secrecy and cunning of which human ingenuity is capable, yet it is in proof, upon which the jury were authorized to act, that defendants have absolutely cut this plaintiff off from following his chosen profession, and they do not offer to retract it or to modify it, but have stood up all along and reiterated it and repeated it whenever an opportunity presented itself. The plaintiff was unable to follow his chosen avocation. The defendants may deny that they meant him any harm, the courts may hold that on account of the ingenuity and chicanery with which it has been surrounded by these ingenious defendants that it is not true, but it nevertheless stands out that Ely can no more get a job of railroading as a section foreman, which is his chosen profession and at which, according to the undisputed proof, he can make more by $25 per month than any other, than he can stretch his wings and fly. We have appealed to them for mercy and have actually begged at their hands for the return of our right that have been so ruthlessly taken from us, and our appeals have been in vain, and as a last resort we have come to the courts and joined issue with them, and in an unequal contest, fighting brains and power, we have been able to show that they have imposed upon us a punishment that is unjust, that is cruel and harsh, and we appeal to this court for protection. When we ask for bread will you give us a stone?

Argued orally by *Blewett Lee* and *James C. Longstreet,* for appellant, and by *Earle Brewer,* for appellee.

CALHOON, J., delivered the opinion of the court.

Ely had been in the service of the railroad company seven or eight months as section foreman of a section known as "Whitehaven," extending south for eight miles from Memphis, when he was discharged. On his application the company gave him a paper of discharge, or "clearance," as it is called. This paper,

the language of which is the predicate of this proceeding, is in
the following words:

·"G. W. Ely has been employed in the capacity of section fore-
man at Whitehaven, Tenn., on the Mississippi Division of the
Illinois Central Railroad, from May 28, 1901, to November
25, 1901.   Cause for leaving service, unsatisfactory service.
Conduct good.                     D. SHEEHAN, Roadmaster.
   "Approved: A. PHILBRICK, Superintendent."

Ely sued the company and Philbrick and Sheehan in an action
on that clearance as a libel, alleging that his services were not un-
satisfactory in fact, but the reverse, and that the words of the
clearance were the result of a malicious conspiracy between the
defendants to damage him, knowing that it was equivalent to
blacklisting him, and would prevent his ever getting railroad em-
ployment anywhere; and that the actual cause of this action was
that he had given testimony some weeks before in the cause of
one Clogston against the company and Sheehan, in which Clog-
ston recovered large damages.   Ely, after all evidence was in
and instructions acted on, dismissed his case as to Philbrick, but
got a verdict for $25,000 damages against the company and
Sheehan.

Defendants below denied malice or conspiracy; asserted that
the clearance stated the truth, that the services were unsatisfac-
tory; denied that his testimony in the other case had anything to
do with his discharge; and denied that there was any publica-
tion of the clearance, other than to the company's employes,
which was privileged, and necessary for its own protection, and
that of the public from incompetent employes.

Much evidence was taken on both sides to show the efficiency
and inefficiency of the services of Ely.   There was no proof what-
ever of conspiracy, and the only proof of publication was that the
clearance was noted on the books of the company, as customary,
that its employes had access to those books, and that it had been
enveloped and sent to Ely at his request; but, he being absent, it

had been delivered to his wife, and by her seen and shown to Clogston, who was her brother-in-law. On the trial A. A. Clogston was allowed to testify twice that one Jarmon, a road supervisor of the company, had told him that Sheehan was going to have Ely discharged because of his testimony in the other case. This manifestly incompetent testimony was allowed to remain with the jury overnight, and in fact until the close of all the evidence offered by the plaintiff, when the court told the jury that, on reflection, it thought this not proper proof, and to dismiss it from their minds. The court refused to permit defendant's witness Jarmon to testify in rebuttal, because he had not observed the rule, but had been present in court while testimony was being delivered, but then permitted plaintiff to recall Clogston to contradict the testimony of Jarmon on his original examination about the conversation in reference to the discharge, he having denied Clogston's statement.

The competent evidence of malice is very slender indeed. Practically, it is simply that Ely says that Sheehan was cool in manner towards him after his testimony on the trial of the Clogston case. Jarmon swears he had no malice, and had never heard of any. Philbrick swears he had never heard of Ely's swearing until after the discharge. Sheehan swears he never had any malice, never changed his manner towards Ely, and in fact never spoke a dozen words to him in his life, and that the discharge and clearance were based on Jarmon's information. In this case it is well to recur to first principles. It is too manifest for disputation that, whether the contract for service be for a fixed term or not, an employe cannot be compelled to remain in the service of his employer, for that would be to destroy his freedom of action and establish peonage. Correlatively the employer cannot be compelled to retain his employe in service. The one may quit or the other may discharge at pleasure, subject only to an action for damages where the term of employment is fixed and has not expired. Where the term is so fixed and unexpired, and there is a stipulation in the contract of employment author-

izing discharge for unsatisfactory service, the employer is warranted in discharging only for the honest reason of unsatisfactory service, and cannot make that clause a shield against payment, where it is shown that the discharge was not for that cause, but to further some other interest of his own. Where the term is so fixed and unexpired, and there is a stipulation in the contract of employment authorizing discharge for unsatisfactory service, the employer is warranted in discharging only for the honest reason of unsatisfactory service and cannot make that clause a shield against payment, where it is shown that the discharge was not for that cause, but to further some other interest of his own. Where the contract of service is for a fixed period, or the term of it has expired, the employe may quit, or the employer discharge at will, and neither can be compelled to disclose his reason for the action. So, in this case, it is absolutely clear that Ely had the right to quit the service of the railroad company at his own pleasure, with or without cause, upon any reason or no reason, or any freak of fancy which might move him to do so, and the railroad company had an equal right to discharge him, and neither give any reason. It is certainly true, under the rules of law and common sense, that neither had any right to demand of the other a clearance paper, or a certificate of good character, or of efficient work on the one hand, or fair dealing, courteous treatment, or congeniality on the other. People cannot be compelled to give certificates even if, as a matter of morals, they ought to do so. All this is simply a matter of taste and individual conscience. It is not debatable that the language of the clearance paper before us is not libelous on its face, and that, in order to show that it was so in fact, the burden of proof is on the plaintiff, who asked for the paper, to show that it was untrue, known to be false, and published from a malicious motive. As evidence of malice or otherwise, it was clearly error to admit the testimony of A. A. Clogston as to Jarmon's message through him to Ely.

The error is not cured by the statement of the court to the jury the next day to disregard it. The lodgment had been made with the jury, and it was too vital as the only showing of malice, and it seems probable that it alone produced the verdict. It was likewise error to refuse to defendant the right to reintroduce Jarmon in rebuttal to contradict Clogston on the ground that he had not remained under the rule. This amounted in this grave case to a punishment of defendant for the disobedience of the court's order by its witness. It was the witness, not the defendant, who should have been punished.

We do not decide whether the record sufficiently shows publication, nor do we decide the several other questions presented.

*Reversed and remanded.*